Livingston v. McDonald.

---

## LIVINGSTON v. McDONALD.

1. **Drainage:** RETAINING SURFACE WATER. *Semble* that the owner of the higher land has an unqualified right to drain for agricultural purposes the surface water, or water flowing in no regular or definite channel upon his own lands, and is not liable to an action by the lower proprietors for so draining as to prevent any portion of those waters from reaching the land of the lower owner.

2. —— DISCHARGING UPON LOWER LANDS. The owner of the higher land has no right, even in the course of the use and improvement of his farm, to collect the surface water upon his own lands into a drain or ditch, increased in quantity or in a manner different from the natural flow, upon the lower lands of another, to the injury of such lands.

*Appeal from Jones District Court.*

THURSDAY, JUNE 28.

SERVITUDES: UPPER AND LOWER ESTATES AS TO DRAINAGE: LIABILITY OF UPPER OWNER FOR INCREASED

Livingston v. McDonald.

FLOWAGE CAUSED BY MOLE DITCH OR DRAIN, &C.— The plaintiffs are the landlord and tenant of a farm in Jones county; the farm adjoining which is owned and occupied by defendant. The relative natural level of the two farms is such that the surface drainage of defendant's farm flows down upon that of the plaintiffs. A main slough runs through the latter, close to the boundary line, into which a smaller or branch slough, upon defendant's land, discharges itself. In October, 1863, defendant had an *underground or mole drain* excavated upon his land, along the line of such branch slough, by a man whose business it was to draw such drains, and who at the same time constructed one for plaintiffs, upon their land.

Defendant's drain was some two hundred yards in length, commencing at the higher and more distant part of his land, and terminating (still on his own land) about sixty feet from the boundary line; whence the water that over-flowed the receptacle at the end of the drain was conducted in an open shallow channel about thirty feet farther. No change was made in the natural surface at the boundary line, or at any point nearer to it than just stated.

Plaintiffs brought this action in December, 1864, for damages for the injury to their freehold and crops, from the increased flow of water upon their land; and in another count of the petition, charged that defendant's drain was a nuisance, and prayed its abatement as a part of their relief. Charges of willful and vexatious injury were also made in the petition, but were abandoned at the trial. Before the case was submitted to the jury, so much of the action as claimed an abatement of the nuisance was withdrawn by plaintiffs. On the remaining issue the jury found a verdict of $48 for plaintiffs, upon which, after a motion for new trial had been heard and overruled, judgment was entered. Defendant appeals. The whole evidence is in the record.

The principal question on this appeal arises upon the instructions of the District Court given and refused.

The court in its own charge said to the jury: "That if the defendant constructed a ditch or drain upon his land, by means of which a *greater quantity* of water was thrown upon or over the adjoining land of the plaintiff, than would otherwise have flown upon or run over or upon the same, and that by means thereof, the lands of the plaintiff were injured and damaged to a greater extent than if said ditch or drain had not been dug, then the defendant is liable to the plaintiff to the extent of the damage which he has sustained in consequence thereof."

At the *plaintiff's* request the court *gave* the following instructions, which were duly excepted to by the defendant:

"If the defendant, by artificial means, threw the water upon the lands of plaintiff, in a *different manner* from what the same would naturally have flowed upon the same, had such artificial means not been employed, and *thus* injured the lands of plaintiff, defendant is liable therefor, *though the amount of water was not increased* by such artificial means."

"Though the lands or sloughs of the parties to this action were so situated, naturally, as that the water accumulated therein, flowing through and from the same, was injurious to either or both parties hereto, and although defendant dug or cut a drain for the purpose of draining his lands, in the best and most advantageous manner for that purpose; yet, if by so doing he caused a *greater quantity* of water to flow on the lands of the plaintiff, and thereby damaged the lands of the plaintiff, he is liable therefor."

The following instructions were asked by *defendant*, and *refused* by the court, and exceptions duly taken to such ruling:

"If the defendant's drain was constructed in the ordinary course of tillage and improvement of defendant's farm, and

Livingston v. McDonald.

drew water from no land, the natural drainage of which was in any other direction, and discharged all its water upon plaintiff's land, over the natural surface of the ground, and into the slough which was the natural receptacle of the surface water of defendant's farm, the defendant is not liable for any damage caused by the same, although the flow of water may have been *somewhat varied or increased* by the operation of the drain."

"If the defendant's drain was necessary for the enjoyment of his land, and discharged no water which would not have flowed upon plaintiff's premises by the natural surface of the land, the plaintiff cannot recover."

"If no injury has accrued to plaintiff by the direct and immediate action of defendant's drain, the defendant is not liable."

*Wm. G. Hammond* and *John S. Stacy*, for the appellant, cited the following authorities: *Elliott* v. *The Fitchburg Railroad Company*, 10 Cush., 191; Washb. Eas., § 224; *Lammier* v. *Francis*, 23 Mo., 181; *Hays* v. *Hays*, 19 La., 351; *Adams* v. *Harrison*, 4 La. Ann., 165; *Merritt* v. *Parker*, 1 Cox, 460; *Martin* v. *Jett*, 12 La., 501; *Lattimore* v. *Davis*, 14 Id., 164; *Skaufman* v. *Greisemar*, 26 Pa., 407; *William* v. *Gale*, 3 H. J., 231; *Weston* v. *Alden*, 8 Mass., 136; *Anthony* v. *Lapham*, 5 Pick., 175; *Blanchard* v. *Baker*, 8 Greenl., 253; *Wadsworth* v. *Tillotson*, 15 Conn., 366; *Randall* v. *Silverthorne*, 4 Barr, (Pa.), 173; Ang. Water-Courses, § 173; *Tyler* v. *Wilkinson*, 4 Mason, 401.

*F. S. & John McKean*, for the appellee, cited 3 Kent, 439; 12 Wend., 330; 10 Id., 264; 4 Am. Law Reg. (N. S.), 318; *Miller* v. *Louback*, 11 Wright, (Pa.); 17 Johns., 306; 7 Pick., 76; Ang. Wat. Courses, § 339.

DILLON, J.— The questions presented in this case are, in this State, now for the first time to be judicially determined. They are questions of no ordinary interest to the jurist, and of no ordinary importance to the citizen and property owner. In adjudicating them we must duly regard, on the one hand, the just rights of property, and on the other the just demands of agriculture and the improvement of land for farming and agricultural purposes. There is no statute in this State, as there is in some others, defining or regulating the rights of adjacent owners in respect to ditches or drainage. *French* v. *White*, 24 Conn., 170; *Thompson* v. *Treasurer of Wood County*, 11 Ohio, 678; *Stout* v. *Freeholders, &c.*, 1 Dutch (N. J.), 202.)

The rights of the parties are therefore to be determined upon the general principles of the law. Before proceeding to state these as applicable to the case, it is advisable to bring out and define somewhat more definitely the exact nature of the case itself.

The defendant is the proprietor of the higher ground or superior heritage or estate; the plaintiff of the lower and inferior estate. Naturally the water drains or flows from the defendant's low or slough land, into and upon the like land of the plaintiff.

The work of the defendant of which the plaintiff complains, is what is termed a *mole* or underground ditch or drain, about two hundred yards in length artificially constructed, a short distance below the surface in the low or slough land of the defendant, and terminating in an open end or mouth near the land of the plaintiff, through which mouth it discharges the water, which, in its course it has received and collected.

With respect to the effect of ditches or drains constructed in this manner (and they seem recently to have become quite common) the evidence tended to show that they increased the flow of water, concentrating and carry-

ing it off in a body. Some of the witnesses would not say that a given tract of land would, on the whole, discharge more water in a year with one of these mole ditches, than without it; but its effect was said to be to *bring water to the surface* which otherwise would have remained in or soaked through the ground, and that in this way the amount of water flowing on the surface would be increased.

The evidence would warrant the jury in finding that the defendant's drain caused an *increased amount* of water to flow upon and over the plaintiff's land, standing upon it and injuring it, in at least the amount returned by the jury. There is, therefore, no ground to interfere, because the verdict is against the evidence. If the court did not misdirect the jury in respect to the law, its judgment must be affirmed.

The water in question, it must be remembered, was not a running, *natural stream*, with a defined and known channel. With respect to such waters the principles of law, regulating the rights of adjacent proprietors, are well settled. They are nowhere more perspicuously and accurately expressed than by Chancellor KENT (3 Com., 439, 440), whose statement of the law on this subject has, on more than one occasion, been approvingly quoted and followed by the English courts. *Embrey* v. *Owen*, 6 Exch., 353, 369, per PARKE, B.; *Wood* v. *Waud*, 3 Id., 775.

1. DRAINAGE: retaining surface water.

And though the ditch in question is *underground*, we do not deem the water, which it drains or carries, as hidden or subterraneous and unknown, to which class of waters ever since (and indeed before) the well known case of *Acton* v. *Blundell*, 12 M & W., 325, 354 (1843), a rule very different from that governing ordinary water-courses, has been applied. See, on this subject, some of the cases more or less touching the one in hand, the following: Am. Law Reg., vol. 2 (N. S.), p. 65; Prof. Washburn's valuable article on "Rights in Subterranean Waters," and authori-

ties cited; *Bassett* v. *Salisbury Manufacturing Company*, 3 Am. Law Reg. (N. S.), 223, with Judge REDFIELD'S note and cases, p. 238; *Chatfield* v. *Wilson* (correlative rights of adjacent owners respecting *percolating* water), 28 Vt., 49; *S. C.*, 5 Am. Law Reg. (O. S.), 528; *Harwood* v. *Benton*, 32 Vt., 724; *Roath* v. *Driscoll* (treating subterranean water as part of the earth, as to ownership), 20 Conn., 533; *Brown* v. *Illins*, 27 Id., 84; *Chasemore* v. *Richards*, 5 Jur. (N. S.), 873; 5 H. & N., 990; *Ellis* v. *Duncan* (cutting off underground supply of water from plaintiff's spring), 21 Barb., 230; *S. C.*, affirmed by Court of Appeals, March, 1864, as stated in *Goodale* v. *Tuttle*, 29 N. Y., 459 (1864); *Wheatley* v. *Baugh*, 25 Penn., 528; *Rauston* v. *Taylor*, 33 Eng. L. & Eq., 428; 11 Exch., 369; Id., 602; *Smith* v. *Kenrick*, 62 Eng. C. L., 513; *The New Albany and Salem Railroad Company* v. *Peterson*, 14 Ind., 112; *Luther* v. *Winnisiurmit Company*, 9 Cush., 171.

This is strictly a question of drainage, a question relating to *surface* or superficial percolating waters, which, though customarily and naturally flowing in a known direction and course, have, nevertheless, no banks or *channels in the soil.*

Now, the cases (see some of them above referred to) hold, and perhaps rightly hold, that with respect to *such waters* the defendant would have such ownership that he would not be liable, if in the improvement of his land or to supply his own uses, he should appropriate them *all*, and thereby prevent any portion of them from *filtrating* through, or *percolating* into or *flowing* upon the plaintiff's land. *Chatfield* v. *Wilson, supra; Rawston* v. *Taylor*, 11 Exch. (H. & G.), 369.

But upon this we need give no definite opinion, as we deem it to be, though a somewhat similar, yet not necessarily the same question as the one presented in the case at bar.

Still, the principle seems to be correct (as held in *Rawston* v. *Taylor*, *supra*), that the owner of the higher land has an *unqualified right* to drain for agricultural purposes his *surface water*, *i. e.*, water flowing in no regular and definite channel, and is not liable to an action by the lower proprietor for so draining it as to prevent any portion of those waters from reaching the land of the lower owner.

PLATT, B., in delivering his opinion in the case last referred to, very pointedly said: " This was merely *surface water*, and the defendant had a right to drain his land, and the plaintiff could not insist *upon defendant maintaining his field as a mere water table.*"

So with equal force and point, LEWIS, Ch. J., in delivering his opinion in a recent and well considered case (*Wheatly* v. *Baugh*, 25 Penn. [1855], 528) remarked: " Accordingly the law has never gone so far as to recognize in one man a right to convert another's farm to his own use *for the purposes of a filter.*" And see also opinion of DENIO, Ch. J., in *Goodale* v. *Tuttle*, 29 N. Y., 459; *Broadbent* v. *Ramsbotham*, 11 Exch., 692; *Chasemore* v. *Richards*, 5 H. & N., 982; 2 Am. Law Reg. (N. S.), 65, *et seq.*

This right of the higher owner thus to retain, and if he sees fit, to appropriate *all* of his surface waters to his own use, is based upon his dominion over the soil which extends indefinitely upwards and downwards, and is adopted as favoring the reclamation and improvement of wet and miry lands.

The upper owner having this right in and control over the surface waters, the question more immediately presented in the case at bar now comes: How far may he interfere with the natural flow of these waters, if, instead of retaining them as he may on his own land, he chooses to allow them to pass on to the lower land of his neighbor?

2. —— discharging upon land of another.

In examining this subject and in seeking to settle it upon proper principles, it would be inexcusable to overlook the doctrines of the civil law respecting it. That law, embodying the accumulated wisdom and experience of the refined and cultivated Roman people for over a thousand years, though not binding as authority, is often of great service to the inquirer after the principles of natural justice and right.

By the civil law, certain easements, or *services* (as they were termed by that law), were based upon the relative situation of the premises; and the lower land owed to the higher land the *service* or *servitude* of being bound to receive all of the water which *naturally* (without the hand of man) flowed down upon it. The inferior proprietor could not obstruct the flow to the injury of the superior proprietor, nor could the latter make the servitude more burdensome.

These rules are adopted by the 640th article of the Code Napoleon, relating to "easements derived from the situation of the premises." That article may be translated as follows: "The owner of the lower ground is bound to receive from the higher ground the water which naturally flows down without the human hand contributing to its course. The owner of the lower ground is not permitted to make a dike to prevent such flowing. The owner of the higher ground can do nothing to aggravate the servitude or easement of the lower ground."

In *Martin* v. *Jelt* (12 La., 501, 1838), the civil law rule and the rule under the Code of Louisiana were carefully considered. The Civil Code of that State provides that where two estates are situated adjacent to each other, the one below owes to the other a *natural servitude* to receive the waters which *naturally* flow from the estate situated above, provided the industry of man has not been used to create that servitude; the proprietor below is not at liberty

to raise any dam, or make any other work to prevent this running of the waters, *and the proprietor above can do* NOTHING *whereby the natural servitude may be rendered more burdensome*. La. Code, art. 656.

The parties in *Martin* v. *Jett*, were owners of adjacent tracts of land, "and," says the court, "the defendant's tract, which is situated below, owes a servitude to that of the plaintiff, to receive the waters which run *naturally* from it." And commenting on the last clause of art. 656 (above italicised), the court make some very important observations, so applicable to the case in hand, that we feel justified in quoting them somewhat at length.

"If we were to take" remarks the court, "this last clause in its strict literal sense no doubt would remain on our minds, but that the plaintiff, by cutting numerous ditches on his land, leading to a central reservoir, had greatly aggravated the servitude due by the adjoining estate. By means of such canals, the waters which would otherwise remain stagnant in several ponds in different parts of the tract, or *gradually flow* on to the defendant's land, exposed to evaporation when spread over a wider surface, are collected and poured in a mass upon his neighbor, and during heavy rains might seriously injure his crop. But it is contended, that although our Code contains no explanatory article similar to that in the Code Napoleon, which in controversies like the present, directs the tribunals to decide in such a manner as to reconcile the respect due to property with the interests of agriculture, yet such ought to be the interpretation of the article in question [of our Code."]

"Let us see to what extent the corresponding article in the Code Napoleon has been thought, by able jurists in France, to authorize any artificial works, by which the servitude might be rendered more onerous, with a view of favoring the great interest of agriculture. Duranton, in

commenting upon the 640th article of the Napoleon Code, *which forbids the owner of the superior estate to do anything which might aggravate the condition of the inferior one,* says : 'Thus he cannot make on his land any works which would change the natural passage (immission) of the water upon the inferior estate, *either by collecting it upon a single point,* and giving it thereby a more rapid current, and more apt to carry down sand, earth or gravel upon the land, or by *directing upon a point upon the same land a much greater volume of water* than it would have received without such works. 1 Dur., No. 164, citing Book 1 Digest, § 1. But the same author proceeds to say, that the owner of the superior estate may make any work upon it necessary, or simply useful to the cultivation of his land, such as furrows in a planted field. He may also, in planting vines, or forming a meadow, make ·ditches for the irrigation of the meadow, or to·make his vines more healthy and vigorous." Id., No. 165.

"We are by no means disposed to give to our (Louisiana) Code such an interpretation as would, in effect, condemn to sterility the superior estate. That every man has the right to clear and cultivate his land cannot be doubted. * * * But it is one thing to clear and cultivate arable lands, and another thing *to reclaim lands naturally covered with stagnant waters, in such a way as to throw the mass of water, which would naturally remain in pools or ponds, upon the lands of one's neighbor situated below.* The Roman law, which, perhaps, forms the best anticipated commentary upon this part of our Code, permitted ditches to be cut by the superior owner, not for the purpose of making water flow upon the adjacent land, but for the purpose of improving, by cultivation, his land, and making it more healthy, and laid down the equitable rule that he ought not to ameliorate his own land to the injury of his neigh-

bors.". *Sic debere quem moliorem agrum facere, ne vicini deteriorem faciat.* Digest I, § 4.

"Each of the neighbors," says Pothier (Cust. Orleans, title XIII), "may do upon his own heritage what seemeth good to him, in such manner, nevertheless, that he doth not injure the neighboring heritage."

The very case now before the court was, as it appears to us, met and provided for by the laws of Justinian. The distinction seems to be between injuries occasioned by strictly agricultural operations, and those occasioned by works designed to reclaim or improve the land. In favor of agriculture, injuries by flowing water done to a neighbor, as the result of *ordinary farming* operations (as with the plow in raising crops), were not actionable. But, if one, with the design and purpose of reclaiming and improving his land, makes ditches upon it and thus, by an increased flow of water, or otherwise, causes an actual injury to the lower owner, he is liable therefor. Corp. Jur. Civ., 39, tit. 3, §§ 2, 3, 4, 5. See translation of §§ 3 and 4, in note.*

It may be doubted whether the common law courts in this country would adopt what seems to be the rule of the

---

* Lex 1, §§ 3, 4, Digest 39, 3.

"SEC. 3. Quintius Mucius says that no action would lie, if a man, for the purpose of cultivating the soil, does some work with the plow, by which water is brought into the premises of his neighbor. But Trebatius takes out only such cases, where the *work done with the plow was necessary for the purpose of raising crops*, the action lying for works *designed to improve the ground.*"

"SEC. 4. Mucius says that *ditches* made to drain the ground, though performed for *agricultural purposes, are not permitted to be made for the purpose of conducting the water into the adjacent premises*, because a man must not improve his premises *in such a way as to injure his neighbor.*"

See commentaries on above by Phibaut, System des Pandekten, Richts., § 589; Dr. Maceldcy's *Lehrbuch*, &c., § 267, b. Domat (616 Cush. ed.), says: "He who has the upper grounds cannot change the course of the water either by turning it some other way, or rendering it more rapid, or making any *other changes in* it to the prejudice of the owner of the lower grounds." And see *Bellows* v. *Sackett*, 15 Barb., 99, 102; *Delahoussaye* v. *Judice*, 13 La. Ann., 587 and other Louisiana cases cited in the opinion.

civil law, so far as to preclude the lower owner from making, in good faith, *improvements* which would have the effect to prevent the water of the upper estate from flowing or passing away. But, even here, the lower owner should properly respect the rights of his neighbor. *Earl* v. *De Hart*, 1 Beas. (N. J.), 280.

The courts might not allow the lower owner to make a dike or embankment, for the express and only purpose of flowing back water upon his neighbor. But if the lower owner, in the way of improvements judiciously made, filled up his land, and this had necessarily or reasonably the consequential effect to stop the natural passage way of mere surface waters, it would seem to be the opinion of Chief Justice DENIO that such lower owner would not be liable. " In respect to the running off of surface water caused by rain and snow, I know," says this able judge (*Goodale* v. *Tuttle*, 29 N. Y., 459), " of no principle which will prevent the owner of land from filling up the wet and marshy places on his own soil for its amelioration and his own advantage because his neighbor's land is so situate as to be incommoded by it." This language, however, was, it should be remarked, used with reference to *town*, and not country property. And see and compare *Earl* v. *De Hart*, 1 Beas. (N. J.), 280 ; *Overton* v. *Sawyer*, 1 Jones (Law), 368.

The rules of the civil law as above shown, clearly support the charge of the court below, and those rules, so far as they deny to the upper owner the right to collect the water in a body, or precipitate it in greatly increased or unnatural quantities upon his neighbor, to the substantial injury of the latter, we deem to be just and equitable. See also, *Laumier* v. *Francis*, 23 Mo., 181 ; *Adams* v. *Harrison*, 4 La. Ann., 165 ; *Hays* v. *Hays*, 19 La., 351 ; *Lattimore* v. *Davis*, 14 Id., 164 ; Washb. on Ease., p. 224, § 16 ; *Delahoussaye* v. *Judice*, 13 La. Ann., 587.

And to this extent it is supported by the weight of authority in the common law courts.

Thus, in the very recent case of *Miller* v. *Laubach*, 11 Wright (47 Pa.. St. R.), 154 (1864), which was an action for damages, caused by turning water from the land of the defendant to that of the plaintiff, the charge of the court to the jury, that if they found that the defendant collected water from his own land, and turned it in a body upon that of the plaintiff, through an *artificial* channel, to his injury, the latter was entitled to recover the damages he had sustained, was not error. But the owner of land through which a *stream flows*, may increase the volume of water therein by draining into it, without liability for damages to a lower owner, but he cannot, by any artificial channel, drain off the water standing upon his own land to that of another.

And *Kauffman* v. *Griesmer*, 26 Penn., 407, does not decide a different doctrine, though it does not, perhaps, state with exact precision the rule of the civil law; and see, also, *Sharpe* v. *Hancock*, 8 Scott, N. R., 46; *Cooper* v. *Barber*, 3 Taunt., 99, opinion of LAWRENCE, J.; *Wood* v. *Waud*, 3 Exch., 748; *Williams* v. *Gale* (*natural* watercourse increased by ditching), 3 H. & J., 231; *Bellows* v. *Sackett*, 15 Barb., 96, 102. If the recent case of *Gannon* v. *Hargadon*, 10 Allen (Mass.), 106, the advanced sheets of which have been obligingly furnished us by the learned reporter, lays down a principle essentially different from those maintained in this opinion, we have only to say that we prefer the view taken by us.

In the determination of this case we recognize the general rule that each may do with his own as he pleases; but we also recognize the qualification, that each should so use his own as not to injure his neighbor. *Sic utere tuo ut alienum non laedas.*

Now, in this case it was undoubtedly practicable for the

defendant to have had his drain terminate at a point more distant from the land of the plaintiff, or to have provided a larger reservoir or receptacle for the water, or by side ditches to have distributed the surplus water, as he lawfully might on his own land, and allowed it to flow (as before the mole ditch was made) upon the plaintiff's land gradually, and from a wider surface.

The court, in substance, laid down the law to the jury to be that if the ditch in question *increased the quantity of water* upon the plaintiff's land to his injury, or without increasing the quantity, threw it upon the plaintiff's lands in a *different manner*, from what the same would naturally have flowed upon it to his injury, the defendant was liable for the damage *thus* occasioned, even though the ditch was constructed by the defendant in the course of the ordinary use and improvement of his farm.

Upon the whole, we think, that in this case, the law was properly stated. And in so holding we add that we do not lay down any rule applicable to *town or city property* See *Bentz* v. *Armstrong*, 8 Watts & Serg., 40; *Goodale* v. *Tuttle*, 29 N. Y., 459, or (as cases of this kind greatly depend upon their special circumstances) to improvements of a different character.

We recognize the fact (to use Lord TENTERDEN's expression) that surface water or slough water is a common enemy which each landowner may reasonably get rid of in the best manner possible; but in relieving himself he must respect the rights of his neighbor, and cannot be justified by an act having the direct tendency and effect to make that enemy less dangerous to himself and more dangerous to his neighbor. He cannot make his estate more valuable by an act which unnecessarily renders his neighbor's less valuable.

Having, as we have shown, the legal right to retain and control the waters escaping from the ditch, and it being

doubtless practicable to do so, we cannot but regard the act of the defendant as unnecessarily injurious to the plaintiff. And in so holding we do not think we unduly abridge or unreasonably narrow the right to make drains for the improvement or reclamation of low or wet lands. Very little is gained if the same act which dries up one tract of land renders the adjoining tract twice as difficult to redeem.

We perceive no error in the action of the court, after instructions given but before the cause was finally submitted to the jury, in allowing the plaintiff to withdraw that portion of the petition asking the abatement of the drain as a nuisance.

Affirmed.